## NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY

v.

### Thomas HASTINGS, Jr.

### Civ. A. No. 88–631 L.

United States District Court,
D. Rhode Island.

April 3, 1990.

Christine Gravelle, Providence, R.I., for plaintiff.

Jeffrey Michaelson, Michaelson & Michaelson, Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is presently before the Court for decision after a bench trial. The case involves a misposting of pension funds by the New England Mutual Life Insurance Company (New England Mutual) to the account of defendant, Thomas Hastings, Jr., which funds should have been credited to the account of defendant's father, Thomas Hastings, Sr. Esther Hastings, the widow of Thomas Hastings, Sr. and the named beneficiary under his pension plan, initiated this action against New England Mutual to recover the sum of money that should rightfully have been credited to her husband's account. New England Mutual then filed a third-party claim against Thomas Hastings, Jr. demanding restitution for the overpayment which he mistakenly received as a result of the alleged misposting of funds.

On January 11, 1990, after the dismissal of Esther Hastings' action against New England Mutual, a non-jury trial was commenced with regard to New England Mutual's claim for restitution against Thomas Hastings, Jr. The trial lasted for two and one half days and after the conclusion of final arguments, the Court took the matter under advisement and gave counsel time to submit post-trial memoranda. Having heard the testimony, read the exhibits and studied the pre-trial and post-trial memoranda, this Court now makes the following determinations.

## BACKGROUND

The original plaintiff in this case, Esther Hastings, was the wife of Thomas Hastings, Sr. who died on March 24, 1985. Prior to his death, Thomas Hastings Sr. was employed as the Executive Director of the Boys Club of Newport County. As an employee of the Boys Club, Mr. Hastings, Sr. contributed to and participated in a pension plan called the "Boys Club of America Pension Plan" which was created, invested and distributed by plaintiff, New England Mutual. Defendant, Thomas Hastings, Jr. was also an employee of the Boys Club and also participated in the Boys Club of America Pension Plan until he terminated his employment with the club in 1985.

Plaintiff, New England Mutual, manages a number of investment vehicles used by the Pension Trust of the Boys Club of America. In 1983, pension consultant Leaton & Huppeler Company, Inc. suggested to the trustees of the Boys Club of America Pension Trust that they diversify the assets of the trust. Leaton & Huppeler then offered and sold various new investment options to the participants in the pension plan. Both Thomas Hastings, Jr. and Thomas Hastings, Sr. chose to diversify their investment at that time and each filled out a "Selection Form" directing Leaton & Huppeler to transfer certain percentages of each's existing accounts into the new investment funds. Leaton & Huppeler transmitted both Selection Forms to New England Mutual which determined the cash amounts to be allocated to each fund. New England Mutual then forwarded all the relevant information to Boston Financial Data Services, the transfer agent, whose function was to issue the corresponding checks, payable to New England Mutual, on behalf of each participant. In preparing the checks, however, the transfer agent deviated from the letter of instruction sent by New England Mutual and mistakenly made payable to the account of Thomas Hastings, Jr. a check in the amount of $13,992.60 which should have been payable to the account of Thomas Hastings, Sr. Boston Financial then forwarded the check to New England Mutual for deposit into the

account of Thomas Hastings, Jr. instead of Thomas Hastings, Sr.

The pension proceeds held for the benefit of Thomas Hastings, Sr. were distributed in full to his widow, Esther Hastings, upon his death in 1985. Thomas Hastings, Jr. withdrew all the monies he had accumulated in the pension trust in conjunction with the termination of his employment with the Boys Club in the fall of 1985.

Eventually, New England Mutual discovered that an error had been made and determined that on June 13, 1983, during the diversification of the Pension Trust assets, $13,992.60 which should have been deposited into Thomas Hastings Sr.'s investment fund was mistakenly deposited into his son's account. Thus, in 1985, when Leaton & Huppeler distributed to Thomas Hastings, Jr. the amount held in trust on his behalf, he received a windfall of $14,-899.60 ($13,992.60 plus interest) to which he was not entitled.

In September of 1988, Esther Hastings brought suit against New England Mutual to recover the funds which were mistakenly diverted from the pension fund of Thomas Hastings, Sr. New England Mutual then filed a third-party claim to recover from Thomas Hastings, Jr. the amount of the overpayment he received. After New England Mutual paid to Esther Hastings the additional $14,899.60 to which she was entitled as the beneficiary of her husband's pension plan, the parties agreed by stipulation to the dismissal of Esther Hastings' action against New England Mutual. New England Mutual then proceeded to trial with respect to its remaining claim for restitution against Thomas Hastings, Jr.

## DISCUSSION

There is only one issue in the case now before this Court—that is, should Thomas Hastings, Jr. be required to remit to New England Mutual the amount of the overpayment he received from the distribution of his pension fund in 1985. The Rhode Island Supreme Court has recognized the firmly established general rule that a party may recover any money paid to another under the influence of a mistake in fact. *Jonklass v. Silverman*, 117 R.I. 691, 698,

370 A.2d 1277, 1281 (1977). There is an equally well recognized exception to the general rule, however, which provides that recovery will not be permitted if the payment has caused such a change in the position of the payee that it would be unjust to require a refund. *Id.* In *Jonklass*, the court stated that in order to defeat an action to recover money paid by mistake, the change in position "must be detrimental to the payee, material and irrevocable." *Id.* Furthermore, the court held that the burden is on the person asserting the defense of a change of circumstances to prove that it would be inequitable to require restitution. *Id.*

The Rhode Island Supreme Court decision in *Jonklass* sets the framework for this Court's discussion of whether it would be equitable to allow New England Mutual to prevail on its claim for restitution against Thomas Hastings, Jr. Thus, the Court must determine whether Thomas Hastings, Jr. changed his position before and upon receipt of the overpayment to such a degree that it would be unfair to now require him to return the money. In order to make such a determination, the Court cannot rely on a mechanical application of the governing rule of law, but, rather, must look carefully at the unique nature of the particular case. After a careful review of the special facts and circumstances surrounding the case *sub judice*, this Court concludes that it would be unjust to require Thomas Hastings, Jr. to repay the additional $14,899.60 that he mistakenly received as part of his pension payout in 1985. New England Mutual's claim for relief must, therefore, be denied.

The Boys and Girls Clubs of Newport County were founded by Thomas Hastings, Sr. and run as a family organization for many years. Thomas Hastings, Jr. began working for the Boys Club part-time when he was in high school and obtained a full-time position upon his graduation from high school in approximately 1971. Prior to his death in 1985, Thomas Hastings, Sr. was the Executive Director of the Boys and Girls Clubs in Newport County. At that time, Mr. Hastings, Jr. was a unit director

of the Middletown Boys and Girls Clubs and also the director of the Outdoor Educational Center in Saunderstown. As part of his compensation, Thomas Hastings, Jr. was allowed to live at the Center in Saunderstown with his wife and children on property that was leased by the Boys Club.

Upon his father's death in 1985, Mr. Hastings, Jr. was appointed acting Executive Director of the Newport Boys and Girls Clubs and he served in that capacity for a period of time while the club was looking for a new, permanent executive director. A search committee was formed which selected one candidate for the position but the final determination had to be made by a vote of the Board of Directors. The members of the Board were sharply divided between choosing the search committee candidate and choosing Thomas Hastings, Jr. as the new executive director of the Boys Club. Initially, Mr. Hastings received a majority of the votes for the position. The original vote, however, was challenged as being illegal since proxies were used. When a subsequent vote was taken, the candidate chosen by the search committee prevailed.

Ultimately, Mr. Hastings agreed to relinquish his claim to the position of Executive Director and terminate his employment with the Boys Club. The circumstances under which Mr. Hastings left the Boys Club and received the payout from his pension plan are the focus of the Court's inquiry into whether Mr. Hastings made a detrimental, material and irrevocable change in position making it inequitable to require him to now refund the amount of the overpayment that he received.

Mr. Hastings testified at trial that although he had originally won a majority of the vote of the Board of Directors, he reached an agreement with Edward Corcoran, the President of the Boys and Girls Clubs, that he would leave the club under certain conditions. He further testified with regard to his discussion with Mr. Corcoran,

A. There were several important things that were discussed. My father and I, and our family, had built the Boys Club for some thirty years— ... The Boys Club was being ruined at the time because of a division of the vote. I—Mr. Corcoran, Larry Nunes and I sat down and we discussed terms of redoing the board structure, going into the by-laws and constitution of that organization to make the organization strong again. In return for some monies, that I would step down if these things were met. An agreement was made. I have proof of that. It was a very important decision in my life, and every factor, not [sic] including the monies, but every factor was very very important to what my father had built.

Mr. Hastings also testified to the following:

Q. Was there an agreement regarding your continued employment at the Boys Club?

A. Yes, there was.

Q. And how long were you to be employed under that agreement?

A. I asked for a contract for one year.

Q. Okay.... Was there any agreement regarding cash payment to you?

A. There certainly was.

Q. Okay. And what was the amount of that?

A. There was two amounts. One was my pension money, and then also there was a $5,000—around $5,000, I was requesting from the Board of Directors, those two amounts.

Q. Okay. What was the amount of the pension money?

A. I was told that I had in the pension roughly around $40, $45,000.

Q. Was that knowledge regarding the amount in your pension a critical factor in your agreeing to the total agreement.

A. It was.

Q. Why was it critical?

A. It was very critical because I had to move my family. I didn't even know where I was going to go, but I knew at the termination or the end of that contract they would ask me to leave, and so it was vital that I could get out with my children and live the same type of life that I grew up so many years to—my wife and I had established, so it was a

very crucial thing, and I had called Leaton & Huppeler, talked to Miss Pace and she quoted me the amounts. Barbara and I sat down and we discussed—

It was just very crucial that we knew what we were doing. We had never dealt like this before. My father was the business person behind the organization. I never dealt with any top brass, any lawyers. I mean, it was a whole new ball game to me. I was advised by very influential people in the community not to trust anyone, to get everything in writing, to make sure that I was moving in the right direction. By doing that, I even gained stronger support, and people were going to take the Boys and Girls Club, and Mr. Corcoran to court, and they did not want me to leave, but I left because I felt the Boys Club was going to be hurt very dearly, and that's not what we wanted, but also I felt we could leave with the understanding that I could finance myself, that we would survive this transfer, but it was a very scary time in our lives.

In response to additional questioning as to why the pension money was critical, Mr. Hastings stated:

A. We had to figure out exactly how much it was going to cost us to leave. We had to know. It was a vital part.
Q. And why did you have to know?
A. Because I realized that I'd have to financially, one, find another place to live; two, have some firm foundation to make that decision. If I didn't have the finances to do it, I wouldn't—we couldn't do it. We would have to stay and fight it out, so to speak.

The testimony of Thomas Hastings, Jr. makes clear that his decision to leave the Boys Club had a significant impact on his life and that of his family. His testimony also indicates that the amount of money that he would receive as a payout from his pension plan was a critical factor in his determination as to whether he could afford to leave his job. Before Mr. Hastings agreed to give up his fight for the position of Executive Director and leave the club, he and his wife, Barbara, sat down and

calculated how much money they would need in order to move off the Boys Club property in Saunderstown, find a new home and continue to provide for themselves and their four young children. Mr. Hastings had been informed by Leaton & Huppeler of the specific amount of money which he had accumulated in his pension fund account and he relied on that figure in calculating whether it would be enough to provide him with the financial stability to relinquish his claim to the position of Executive Director and look for other employment. After determining that it was financially feasible, Mr. Hastings entered into an agreement with Mr. Corcoran whereby he agreed to leave the Boys Club on the condition that he would remain employed as a unit director for one year and also receive a severance payment of $5,000. Although the distribution of his pension money was not included as part of the formal agreement, it was clearly an important factor in Mr. Hastings' decision to leave the club.

Mr. Hastings testified at trial that he used the money he received from his pension plan to buy a house and pay bills. Several courts have held that where a party has used a mistaken payment to purchase property of value, there is no detrimental change in position because the person would have the benefit of the property purchased. *See Shearson/American Express, Inc. v. Mann,* 814 F.2d 301 (6th Cir.1987) (erroneous payment used to purchase real estate investment properties not detrimental change in position); *Kunkel v. Kunkel,* 267 Pa. 163, 110 A. 73 (1920) (if defendant spent the money, presumably he has either the things which it purchased or the benefit therefrom). Furthermore, as the dissent noted in *Jonklass,* payment of pre-existing debts would normally be insufficient to constitute a detrimental, material and irrevocable change in position. *Jonklass,* 117 R.I. at 700, 370 A.2d at 1282 (Joslin, J. dissenting).

The application of equitable principles to a particular set of facts, however, cannot be mechanical or technical. The issue is not what Mr. Hastings bought with the money, but, rather, whether he so changed

position in reliance on the overpayment as to make restitution inequitable.

In *First National City Bank v. Mc-Manus*, 29 N.C.App. 65, 223 S.E.2d 554 (1976), the trustees of a pension plan brought an action to recover overpayments made to a qualified participant under the plan. In determining whether the over-payment caused such a change in the position of the payee that it would be unjust to require him to refund the money, the court opined that " '[a] change of position is not detrimental, and is not a defense, if the change can be reversed, or the status quo can be restored, without expense.' " *Mc-Manus*, 29 N.C.App. 65, 223 S.E.2d at 558 (citation omitted). In *McManus*, defendant payee asserted that his change in position resulted from the increased tax liability generated by the payment, the necessity and cost of defending his stake in the matter and the fact that the fund proceeds had been invested "in a business operation." *Id.* In rejecting defendant's contention that such expenditures raised a legitimate change of position defense, the court noted that "[w]here a payee uses '. . . the errone-ous payment to acquire property of value . . . [there can be no] detrimental change of position.' " *Id.* (citation omitted). In that case, however, the court found that when defendant invested funds in a business ven-ture, he merely transferred his interest from a cash position to some type of equity position. *McManus*, 29 N.C.App. 65, 223 S.E.2d at 559. Thus, such a change could be easily reversed and the status quo re-stored.

Like the defendant payee in *McManus*, Thomas Hastings, Jr. also acquired proper-ty of value with the overpayment he re-ceived from the distribution of his pension fund. Mr. Hastings' situation, however, is unique because his subsequent change of position cannot be reversed nor can the status quo be restored. Mr. Hastings can-not turn the clock back to 1985 and recon-sider whether he could afford to leave the employ of the Boys Club at that time. De-fendant relied on the information that he was given by Leaton & Huppeler as to the amount of money he would receive from his pension fund and that amount was a critical factor in his decision not to pursue the fight for the position of Executive Di-rector. As a result of that important and irrevocable decision, Mr. Hastings had to give up his house, find a new home for his family and find a new job. In purchasing a home, therefore, Mr. Hastings did not sim-ply "acquire something of value." In pur-chasing a home, Thomas Hastings, Jr. was closing one chapter in his life and starting over again in another. Thus, even if he sold his home to repay the money, he could not be put back in the position he was in when he made the decision to leave the Boys Club.

In a case more similar to the one at bar, a city employee opted for early retirement based on representations which were made to him regarding the amount that he would receive in pension benefits. *Kern v. City of Flint*, 125 Mich.App. 24, 335 N.W.2d 708, 709–710 (1983). The employee and his wife had determined that he would require at least $700 per month in order for him to retire and he was informed that he would receive at least that amount. *Id.* After receiving monthly payments of $734.17 for approximately two years, the city informed the former employee that his benefits had been miscalculated and that he was only entitled to $647.06. *Id.* In *Kern*, the court recognized the general rule that where one pays money to another by mistake, that person is entitled to recover the amount of the overpayment. *Id.* However, applying the change of circumstances exception to the general rule, the court found that since Kern would not have retired if he had known that he would receive less than $700 per month, it would be inequitable to re-duce his payments to less than that amount. *Id.*

In the present case, the Court cannot determine what Mr. Hastings would have done if he had known that the payout from his pension plan would be substantially less than the amount that he actually received. It is clear, however, that such knowledge would have been vital in his determination as to whether he could afford to leave the Boys Club at that time. Mr. Hastings' position, therefore, is similar to that of the

employee in *Kern,* and the change of circumstances defense should be equally applicable to relieve him of liability for the overpayment he received.

Applying the guidelines established by the Rhode Island Supreme Court decision in *Jonklass* to the facts of this particular case, the Court determines that it would be inequitable to require Thomas Hastings, Jr. to repay the $14,899.60 which he mistakenly received as a distribution from his pension fund back in 1985. Mr. Hastings obviously relied on the payment and suffered a change in position which was unquestionably detrimental, material and irrevocable. "The crucial question in an action of this kind is, to which party does the money, in equity and good conscience, belong?" *McManus,* 29 N.C.App. 65, 223 S.E.2d 554, 558 (1976). In this case, the answer is clear. In equity and good conscience, the money belongs to Thomas Hastings, Jr.

CONCLUSION

For the reasons stated herein, the Court holds that New England Mutual Life Insurance Company is not entitled to restitution from Thomas Hastings, Jr. The Clerk will enter judgment for the defendant forthwith.

*It is so Ordered.*